Robert J. McKennon (SBN 123176) *rm@mckennonlawgroup.com*
Joseph S. McMillen (SBN 174561) *jm@mckennonlawgroup.com*
**McKennon Law Group PC**
20321 SW Birch Street, Suite 200
Newport Beach, California 92660
Phone: 949-387-9595 | Fax: 949-385-5165

Attorneys for Plaintiff Vicky Ibarra

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA – SOUTHERN DIVISION

| | |
|---|---|
| VICKY IBARRA,<br><br>               Plaintiff,<br><br>vs.<br><br>HARTFORD LIFE AND ACCIDENT INSURANCE COMPANY; and DOES 1 through 10, inclusive,<br><br>               Defendants. | Case No.:<br><br>COMPLAINT FOR RECOVERY OF ERISA PLAN BENEFITS; ENFORCEMENT AND CLARIFICATION OF RIGHTS; PRE-JUDGMENT INTEREST AND ATTORNEYS' FEES<br><br>[Filed Concurrently with:<br>  -  Civil Cover Sheet;<br>  -  Summons; and<br>  -  Certification of Interested Parties] |



## **NATURE OF ACTION**

1.    In this lawsuit, Plaintiff Vicky Ibarra seeks to recover long-term disability ("LTD") benefits from Defendant Hartford Life and Accident Insurance Company ("Hartford") because she suffers from debilitating neck, right-shoulder, bilateral-arm, elbow, forearm, wrist and hand pain, numbness, weakness and tremors from pinched and irritated nerves in her cervical spine, elbows and wrists (caused by herniated discs, osteophytes and radiculopathy in her cervical spine, worn-out cartilage in her shoulder joint and cubital and carpal tunnel syndrome from repetitive typing and computer use), and can no longer perform her job duties as a secretary for a medical company or those of any other type of job for which she qualifies. Her employer provided a group LTD benefit plan for the benefit of its employees, including Plaintiff. Hartford funded the plan through a group insurance policy and is the claim administrator for the plan. Plaintiff was enrolled for the disability coverage when she became disabled in February 2015 but, after Hartford conceded she was disabled and paid her benefits for two years under the own occupation clause of the policy, it illogically reversed course. It improperly terminated her benefits in August 2017, based on the plan's change in definition of disability from "own occupation" to "any occupation," despite the fact that she was still obviously disabled under both standards and despite having no significant evidence that her disabling condition had improved. Hartford improperly failed to pay Plaintiff the benefits due her under the policy and the plan, from August 2017 onward, and she is also entitled to interest and her attorneys' fees.

2.    The employee welfare benefit plan and this action are governed by the Employee Retirement Income Security Act of 1974 ("ERISA").



## **THE PARTIES**

3.    Plaintiff is an individual who, at all times relevant to this action, was a citizen and resident of the State of California, City of Irvine, in Orange County.  At all times relevant to this action, Plaintiff was a participant, as defined by Section 3(7) of ERISA, 29 U.S.C. Section 1002(7), in the employee welfare benefit plan that is at issue in this action and was established by her employer, DaVita Healthcare Partners, Inc. ("DaVita"), a dialysis facility.

4.    Defendant Hartford is, and at all times relevant was, a Connecticut corporation and stock insurance company with its principal place of business located in Connecticut.  Defendant Hartford, at all times relevant, administered LTD benefits provided to DaVita employees, including Plaintiff, by issuing group policy number GLT-675580 to DaVita (the group policyholder) for the benefit of its employees (the "Policy").  The Policy, which Hartford issued, is and was the funding source of the LTD benefits for DaVita's employee welfare benefit plan. Hartford is responsible to pay LTD benefits due under the plan.  The DaVita employee welfare benefit plan, including Hartford's group Policy, the certificate of insurance referenced below and all other plan contract documents, are hereafter referred to collectively as "the Plan."  The Plan, including Hartford through the group Policy and certificate, promised to pay LTD benefits to Plaintiff should she become disabled.  Defendant Hartford has acted as a claims administrator and as an ERISA claims fiduciary of the Plan in connection with LTD benefits and the group Policy.

5.    The true names and capacities, whether individual, corporate, associate or otherwise, of the defendants named herein as DOES 1 through 10, inclusive, are unknown to Plaintiff at this time, who therefore sues DOES 1 through 10 by

Case No.:



1  fictitious names and will ask leave of the Court to amend this Complaint to show the
2  true names and capacities of DOES 1 through 10 when the same are ascertained.
3  DOES 1 through 10 are sued as principals and/or agents, servants, attorneys and
4  employees of said principals, and all the acts performed by them were within the
5  course and scope of their authority and employment.  Plaintiff is informed and
6  believes and thereupon alleges that each of DOES 1 through 10 is legally
7  responsible in some manner for the events referred to herein, and directly and
8  proximately caused the damages and injuries to Plaintiff as hereinafter alleged.

## JURISDICTION AND VENUE

12  6.  Plaintiff brings this action to recover disability insurance benefits and
13  to enforce and clarify her rights under Section 502(a)(1)(B) of ERISA, 29 U.S.C.
14  Section 1132(a)(1)(B).  This Court has subject matter jurisdiction over Plaintiff's
15  claim pursuant to ERISA Section 502(e) and (f), 29 U.S.C. Section 1132(e) and (f),
16  and 28 U.S.C. Section 1331.

18  7.  Venue lies in the Central District of California pursuant to ERISA
19  Section 502(e)(2), 29 U.S.C. Section 1132(e)(2), because Plaintiff resides in this
20  district, the alleged breaches occurred in this district and the ERISA-governed plan
21  at issue was administered in part in this district.  Venue is also proper pursuant to 28
22  U.S.C. Section 1391(b) because a substantial part of the events or omissions giving
23  rise to Plaintiff's claim occurred within this district.  Namely, Hartford denied
24  Plaintiff's claim in Irvine, California, in Orange County, within this district.

26  8.  Plaintiff alleges that Defendant Hartford is, and at all times relevant
27  was, duly authorized to do, and doing, business within the County of Orange, State
28  of California, within the judicial district of the Central District Court of California.

-3-



**FACTUAL BACKGROUND**

9.      Ms. Ibarra began working for DaVita in 2012.  At the time she became disabled in February 2015, Ms. Ibarra was employed as one of its administrative assistants/secretaries.[1]  She held that same position the entire time she worked for DaVita.  She always worked full-time, 40 or more hours per week, eight or more hours per day, from when she started in 2012 until she became disabled in 2015. She sat at the front reception desk for DaVita.  Her material job duties included: performing computer work most of the day (80% of the eight-hour day, or 6.4 hours, including typing on the keyboard, data entry, using a mouse and looking at the computer screen); telephone support; receiving visitors/patients at the reception area; billing patients; and clerical tasks like filing, faxing, copying, refilling the fax/copier with paper and receiving, lifting and putting away supplies if they are not too heavy.  The physical requirements of her position included, among other things: bending her head/neck and holding it in place for long periods of time to look at hard copies of documents and the computer monitor and to use the phone; and reaching above waist level and forward to her workstation with her shoulders elevated to use the mouse and keyboard 80% of the day.

10.      In the 15 years prior to becoming disabled, other than her work for DaVita as a secretary, Ms. Ibarra was mostly a housewife and homemaker.  Her only other employment besides DaVita: she worked as a hostess at a hotel for one year in 2009-2010, and as a senior clerk doing office support in 1986, similar to her current position.  Ms. Ibarra has an Associates of Arts degree but no other college education.

---

[1] Hartford concedes in its denial letter that she worked as a "unit secretary" just before becoming disabled.

Case No.:

11.    Pursuant to the terms and conditions of the Plan, Plaintiff is entitled to LTD benefits because she met, and continues to meet, the Plan's operative definition of "disabled" and the other conditions necessary to qualify for LTD benefits during the requisite time period.  The Plan and, specifically, the Policy states in pertinent part that:

**"Disability" or "Disabled"** means You are prevented from performing one or more of the Essential Duties of:

(1) Your Occupation during the [180-day] Elimination Period;

(2) Your Occupation, for the 24 months following the Elimination Period, and as a result Your Current Monthly Earnings are less than 80% of Your Indexed Pre-Disability Earnings; and[2]

(3) after that, Any Occupation.

\* \* \* \*

Your Disability must result from: (1) accidental bodily injury; (2) sickness; [or] (3) Mental Illness . . .

\* \* \* \*

**Essential Duty** means a duty that: (1) is substantial, not incidental; (2) is fundamental or inherent to the occupation; and (3) cannot be reasonably omitted or changed. Your ability to work the number of hours in Your regularly scheduled workweek is an Essential Duty.

[Bold emphasis in original; bracketed portions added].

12.    The "Any Occupation" portion of the Policy's disability standard is most relevant because Hartford conceded that Ms. Ibarra was disabled for the 180-day Elimination Period and conceded and paid her disability benefits for the entire 24-month "Your Occupation" period, i.e., from February 2015 through August

---

[2] Thus, the Policy permits a claimant to work and still be considered disabled as long as her current earnings are 0%-79% of her pre-disability earnings and she cannot perform one or more of her essential occupational duties.  Ms. Ibarra worked part time for two days per week from in or about August 2015 to 2017, but she ceased working altogether in 2017, when her condition worsened.  She never earned more than this threshold and, thus, was and is disabled under the Policy at all relevant times.  Hartford knew that Ms. Ibarra worked part time but it still paid her disability benefits.

2017.  The Policy defines "Any Occupation" as "any occupation for which You are qualified by education, training or experience, and that has an earnings potential greater than the lesser of: (1) the product of Your Indexed Pre-disability Earnings and the Benefit Percentage; or (2) the Maximum Monthly Benefit."

13.    Under the terms of the Plan, Plaintiff is entitled to 50% of her monthly pre-disability earnings, subject to the "Other Income Benefit" section of the Plan. Based on her pre-disability earnings, Plaintiff is entitled to $1,625 per month before adjustments from other income reductions and from working part time.  Benefits are payable after the employee has been disabled for 180 consecutive days, i.e., the Plan's "Elimination Period," in Ms. Ibarra's case, commencing August 2, 2015.

14.    The Policy allows Hartford to require Ms. Ibarra to submit to an independent medical examination by a physician during the claim, when and as often as reasonably necessary.

15.    On February 2, 2015, Ms. Ibarra was forced to stop working at DaVita due to debilitating neck, right-shoulder, bilateral-arm, elbow, forearm, wrist and hand pain, numbness and weakness from pinched and irritated nerves in her cervical spine, elbows and wrists caused by herniated discs/osteophytes (bone spurs)/cervical radiculopathy (a pinched nerve in the cervical spine causing pain to radiate down into the arm and hand, as well as numbness and weakness there), worn-out cartilage in her shoulder joint and cubital and carpal tunnel syndrome[3] from repetitive typing and computer mouse use.  She must wear a brace from her elbow to her wrist.  Ms. Ibarra was actively at work and eligible for disability benefits under the Plan on her

---

[3] Carpel tunnel syndrome is numbness, tingling, weakness and pain in the hand and fingers due to pressure on the median nerve in the wrist.  Cubital tunnel syndrome is similar; it causes numbness/pain in the forearm, hand and fingers due to pressure on the ulnar nerve (elbow/"funny bone" nerve).

1    last day of work, February 2, 2015, before her date of disability.  But as of February

2    3, 2015, her injuries rendered her disabled from working in her own occupation as a

3    secretary/administrative assistant, and any other type of gainful occupation, within

4    the meaning of the Policy.

5

6        16.    To date, Plaintiff's problems have not resolved.  She is currently unable

7    to continuously type on a computer keyboard, use a mouse, reach above her waist

8    level and forward to her workstation to do those actions, hold her head up to look at

9    a computer for long periods of time or bend her neck, without severe pain in her

10   neck, right shoulder and upper extremities, which tasks are all required by her job

11   and the jobs to which Hartford claims Ms. Ibarra can transition.  She is unable to

12   perform these material job duties because of her chronic, severe neck, shoulder, arm,

13   elbow, forearm, wrist and hand pain, numbness, weakness and tremors, which pain

14   is exacerbated by bending her neck or holding it in the same position, and

15   continuous typing and mouse use.  Plaintiff's injuries have rendered her disabled

16   from working within the meaning of the Policy.  Because of this, she is and was

17   unable, at all times from February 2015 through the present and continuing, to

18   perform one (and in fact more) of the essential duties of her own occupation as a

19   secretary/administrative assistant and any other gainful occupation for which she is

20   qualified.  While she worked part time for some of this period (two days per week),

21   she was and is disabled as the Policy so defines.

22

23       17.    After the onset of her disabling injuries, Ms. Ibarra took a leave of

24   absence from work, then applied for, and received, LTD benefits from Hartford for

25   two years, from approximately August 2, 2015 through August 1, 2017.[4]  As alleged

---

[4] She also submitted claims to the Employment Development Department ("EDD")
for California state disability benefits ("CASDI") and to the Social Security
Administration ("SSA") for Social Security Disability Insurance ("SSDI") benefits.
She was approved for both benefits and was paid the maximum CASDI.

Case No.:

later below, however, Hartford then prematurely terminated her LTD benefits while she was still disabled.

18.     On her application, Ms. Ibarra identified all her treating physicians and provided their contact information.  She reported that her doctors had prescribed her Duexis, Diclofenac and Motrin for pain.  She reported that she could not work more than two days per week because of chronic pain in her arm and shoulder caused by repetitive computer and phone use on the job.  She submitted a statement from her physician that certified her inability to work for more than two days per week, eight hours per day, due to the severe neck pain radiating down her arms and the weakness in her arms), and also reported that she was on these restrictions from her physician: working just Tuesday and Thursday with a ten-minute break every hour from the computer, and no heavy lifting.

19.     As part of her LTD claim, Ms. Ibarra provided Hartford with any and all information that it requested, and she granted Hartford full access to her medical records.  The medical records continued to support her claim for LTD benefits, as Hartford confirmed by paying her claim.

20.     In late 2014 and January 2015, Linda Davis, M.D., her primary care physician since 2010, first evaluated Ms. Ibarra based upon her chief complaint of forearm pain, numbness, tingling, weakness and aching from repetitive typing and mouse use at work, worse in her right arm than her left arm.  Dr. Davis examined Ms. Ibarra and performed objective tests that showed weakness in her forearms with resistance and tenderness to palpation there.  Dr. Davis diagnosed her with "pain in limb," and treated her with pain medication, physical therapy and a "trial of one day off per week" from work.  Dr. Davis documented that Ms. Ibarra's symptoms improved when she was off work but recurred when she returned to work.

Case No.:

21.     On February 13, 2015, Hoag Hospital took X rays of Ms. Ibarra's cervical spine, as referred by Dr. Davis, because of her complaints of severe neck pain.  The X rays objectively verify that Ms. Ibarra has bone spurring at the C5-6 level of her cervical spine that causes degenerative disc-space narrowing there.

22.     Ms. Ibarra attended 15 physical therapy sessions during this time period for three months, ending on March 10, 2015, through California Therapy Solutions, as referred by Dr. Davis.  Her physical therapists documented that Ms. Ibarra has: pain and discomfort in the bilateral forearms aggravated at the end of work days, in the right one more than the left one, from computer usage including the mouse; neck pain with the right side more affected than the left side; strain on her upper extremities and neck; and right scapular discomfort and weakness, increasing by the end of the work day.  As of the last session, Ms. Ibarra was making slow progress but continued to feel tension in the bilateral forearms, right shoulder and cervical spine.  Her objective tests showed decreased range of motion, pain and reduced strength in her right wrist, right hand, right shoulder and cervical spine.

23.     On February 17, 2015, Hoag Hospital performed a bone density scan, which confirmed that Ms. Ibarra has osteoporosis and is a high fracture risk. Because of this, she might not be a good candidate for cervical spine surgery to relieve her severe neck pain.

24.     On March 13, 2015, Hoag Hospital did a cervical spine MRI, as referred by Dr. Davis, because Ms. Ibarra had persistent neck pain radiating into her right arm for three months.  The MRI images objectively document: (1) Degenerative disc disease at C3-C4 through C5-C6, including joint hypertrophy; (2) Moderate spinal stenosis with the worst level at C5-C6; (3) Right paracentral disc protrusion at C3-C4 causing right moderate foraminal narrowing; and (4) Left

paracentral disc protrusion at C5-C6 causing moderate-to-severe foraminal narrowing.

25.    On July 30, 2015, Jae H. Chon, M.D. (of the Kerlan-Jobe Orthopaedic Clinic, a Cedars-Sinai Affiliate), an orthopedic spine surgeon and specialist who treats Ms. Ibarra through workers' compensation, had an initial consultation with her. Dr. Chon has regularly examined her in-person ever since, usually every six weeks, for her cervical-spine and related upper-extremity pain. For example, he examined her in-person on July 30, September 17 and November 5, 2015, January 7, March 3, May 26 and August 4, 2016, and January 26 and March 23, 2017. Each time, after observing her, and based on the 2015 cervical MRI, cervical X rays and also 2015 EMG/nerve conduction studies,[5] Dr. Chon certified that Ms. Ibarra could not work more than two days per week (Tuesdays and Thursdays), eight hours per day (i.e., 16 hours per week), in her position as an administrative assistant/secretary — except for a brief stint from March to August 2016 where he attempted allowing her to work 2.5 days (20 hours) per week. That schedule did not work out. Her pain increased, and so Dr. Chon returned to imposing restrictions of working at most two days per week, eight hours per day. Dr. Chon testified to these opinions under penalty of perjury.

26.    During this same time, Thomas E. Knight, M.D. (of the Hand and Wrist Institute), an orthopedic surgeon and hand/wrist specialist who treated Ms. Ibarra through workers' compensation from May 2015 to September 2016, regularly examined Ms. Ibarra in-person every six weeks.[6] She consistently complained of

---

[5] Dr. Chon concluded that the 2015 X rays and MRI showed loss of disc height in Ms. Ibarra's cervical spine and disc bulges at C5-6. He concluded from her EMG/ nerve conduction study that she had carpal and cubital tunnel syndrome.
[6] Dr. Knight relocated his practice to Texas. Thus, Ms. Ibarra transitioned all her orthopedic care to Dr. Chon in 2016.

Case No.:



neck pain and right-shoulder, upper-extremity and forearm pain, from typing on the keyboard and using the computer mouse most of the workday.  She complained at times that pain and tingling extended into her right hand.  Dr. Knight's physical exam and tests in 2015-2016 consistently showed limited range of motion and pain in her cervical spine, tenderness on palpation to her right trapezius muscle and weakness in grip strength in her right hand.  Dr. Knight reviewed Ms. Ibarra's 2015 cervical spine MRI, 2015 EMG/nerve conduction test and X rays of her right hand/wrist, right shoulder and right elbow, which showed cervical disc bulges and stenosis at C5-6, ulnar neuropathy in her elbow nerves, ulnar bone minus variance in her wrist, carpal tunnel syndrome in her wrists, degenerative changes in her hand joints and shoulder-joint narrowing.  Based thereon, he consistently diagnosed her with: cumulative trauma disorder ("CTD") (physical problems resulting from excessive computer use) of the upper extremities and cervical spine, and cervical stenosis with radiculopathy.  He added right radial tunnel syndrome to his diagnosis in September 2016 (fatigue or a dull, aching pain at the top of the forearm with use) based on her tenderness to palpation there.  He recommended "cervical spine surgery consultation as soon as possible," acupuncture, chiropractic care, pain medication and six-week follow-up exams.  Dr. Knight concurred with Dr. Chon's disability opinion.  He certified that, from August 2015 to March 2016, Ms. Ibarra could not work in her position as an administrative assistant/secretary more than two days per week, eight hours per day (Tuesdays and Thursdays), and that she required, even on those days, a ten-minute break every hour from computer use.  He, like Dr. Chon, extended her work schedule to 2.5 days per week briefly for a trial run, from March to September 2016, before he moved to another state.  On his last exam, in September 2016, Ms. Ibarra continued to experience pain in her neck down her right upper extremity including her right forearm despite her ongoing spine treatment.

27.    On August 6, 2016, Eleby R. Washington, III, M.D., a board-certified

-11-

Case No.:



orthopedic surgeon and Qualified Medical Evaluator, performed a comprehensive in-person exam and evaluation of Ms. Ibarra in her workers' compensation matter. He is an independent physician, not favoring the claimant or employer. Ms. Ibarra complained of aching pain in her neck and right shoulder that became burning some days and radiated pain and weakness into her arm. Dr. Washington spent 90 minutes examining and interviewing Ms. Ibarra. He took an extensive medical history, reviewed her medical records and diagnostic tests (including the 2015 cervical MRIs and X rays and the 2016 EMG/nerve conduction study) for three hours, examined her in-person and performed objective range-of-motion and other tests. The tests showed tenderness to palpation over the paraspinal muscles and right trapezius muscle, and reduced grip strength in her right hand. Dr. Washington interpreted her MRI as showing degenerative disc disease in her cervical spine, including two large disc bulges at C4-5 and C5-6 that caused medium spinal stenosis. He interviewed her about her job duties, reported as working as an administrative assistant/secretary who must do a lot of computer work, build charts for patients, print out reports and greet patients when they arrive. Dr. Washington documented that Ms. Ibarra had been treated with epidural steroid injections, physical therapy, chiropractic care and the wearing of wrist braces at times. Based thereon, Dr. Washington diagnosed Ms. Ibarra with cervical radiculitis, which was confirmed by the MRI, and bilateral ulnar neuropathy in her elbows (i.e., cubital tunnel syndrome), confirmed by EMG/nerve conduction studies. Dr. Washington opined that Ms. Ibarra was disabled because of neck and right-shoulder pain that prevent her from performing the essential duties of her job as an administrative assistant/secretary for a full day or a full week. He concluded that she can work, at most, two days per week, just as Drs. Chon and Knight had concluded. Dr. Washington concluded that her symptoms were caused by work, a continuous trauma-type injury, from repetitive computer use.

28.     In January 2017, Ms. Ibarra's vehicle was rear-ended while stopped at a stop light.  She went to the Hoag Hospital Emergency Department two days later, on January 11, 2017, because of sharp pain that radiated from her neck to her head, exacerbated by the motor vehicle accident.  The emergency room physician examined her in-person, confirmed the presence of neck pain, diagnosed her with a cervical strain and prescribed ice, heat and pain medications including Naproxen and a follow-up visit with her primary care physician, Dr. Davis.

29.     On April 5, 2017, Ms. Ibarra had an MRI performed on her right knee at Hoag Hospital, ordered by her primary care physician, Dr. Davis, because she was experiencing knee pain.  The MRI images objectively document a tear in her posterior cruciate ligament, patellar tendinopathy and fluid around her medial collateral ligament.  Her knee pain compounds and is comorbid with her main problems, cervical radiculopathy and upper-extremity pain, weakness and numbness.  Ms. Ibarra complained of the knee pain during her March 27, 2017 exam with Dr. Davis, who diagnosed her with pain in the right knee and prescribed her pain medication.

30.     On April 19, 2017, Dr. Chon completed Hartford's Attending Physician's Statement of Functionality.  He confirmed that he had been treating Ms. Ibarra in-person every six weeks since July 30, 2015, his most recent visit on March 23, 2017, for "severe neck pain radiating down arms & weakness."  He reported the following objective diagnostic test results: (1) November 5, 2015 cervical X rays show instability in her spine; and (2) June 19, 2015 EMG/nerve conduction study verified ulnar neuropathy (nerve damage/irritation in the ulnar nerve in the elbow).  Dr. Chon reported that his physical exam findings included increased pain and limited range of motion in Ms. Ibarra's neck on flexion, extension and rotation.  Based thereon, Dr. Chon diagnosed Ms. Ibarra with cervical spinal stenosis and

spinal instability.  He certified that, in his professional medical opinion as an orthopedic spine surgeon, Ms. Ibarra could work at most "8 hrs. [per day,] 2 days a week only," and that her other restrictions and limitations included, among others, no reaching above or below her shoulder level, and no reaching forward for objects on her desktop or workstation, with either arm, except for "Occasionally (1-33%)" of an eight-hour workday (i.e., this could be anywhere from five minutes to 2.6 hours per workday, though Dr. Chon's precise opinion is unclear, given Hartford's vague, boilerplate form).

31.    On May 1, 2017, Dr. Davis responded to Hartford's written questionnaire.  She answered "yes" to its single question asking: "Were Ms. Ibarra's wrist complaints and numbness/tingling in forearms a direct result or symptoms of her neck complaints, cervical spine imaging, and nerve conduction studies?"

32.    On July 26, 2017, just days before Hartford terminated her benefits, Dr. Chon referred Ms. Ibarra for another electrodiagnostic nerve-conduction study of her right upper extremity, because she complained of pain, paresthesia (burning/prickling sensation) and weakness there, as well as neck, shoulder and elbow pain.  The nerve study was performed by a board-certified physician/ physiatrist in electrodiagnostic medicine.  The study objectively measured that Ms. Ibarra has abnormal activity in her muscles and nerves.  The physician concluded that the study shows: (1) Increased insertional activity in the right cervical C5 (or C6) innervated muscles suggestive of right cervical C5 (or C6) nerve root irritation; (2) Moderate right ulnar neuropathy (nerve damage causing weakness, numbness and pain) across the elbow – slowing of the right ulnar motor nerve across the elbow (cubital tunnel syndrome); and (3) Right median neuropathy of the wrist (carpal tunnel syndrome).  The physician also performed a physical exam, which showed: decreased range of motion; tenderness to palpation; decreased reflexes; decreased

-14-

1  sensation to light touch; and weakness in Ms. Ibarra's cervical spine, cervical

2  paraspinal muscles, right shoulder, trapezius, bicep and triceps muscles, right elbow

3  and right wrist.  The tests showed decreased strength in her right-hand grip and

4  finger abduction.  She was positive for nerve pain in her right wrist and elbow upon

5  a Tinel's test.

6

7       33.    On August 22, 2017, despite the overwhelming medical documentation

8  supporting her disability, Hartford wrote a letter to Ms. Ibarra, informing her that it

9  was terminating her disability benefits beyond August 1, 2017 — after having paid

10  them for two years, from August 2, 2015 through August 1, 2017, for the entire

11  "own occupation" period, based on its conclusion that she did not have the physical

12  ability to work in her own occupation as a "unit secretary" because of cervicalgia.

13  Hartford concluded that disability benefits were no longer payable under the

14  Policy's "any occupation" disability standard because Ms. Ibarra had the

15  transferable work skills and physical capacity to perform the essential duties of at

16  least three sedentary occupations (given her experience in her own occupation as a

17  secretary/administrative assistant for DaVita) and, accordingly, was no longer

18  disabled under the Policy.  Hartford relied on the opinions of two consultants:

19  (1) Joseph Daniels, D.O., an orthopedic surgeon from Medical Consultants Network

20  ("MCN") who reviewed Ms. Ibarra's medical file but did not examine or speak with

21  her or her treating physicians, and vaguely concluded that her medical records

22  showed she could work full time, 32 hours per week, subject to certain physical

23  work restrictions and limitations such as "right upper extremity motions should be

24  avoided at this time," it is unknown how much the cervical-spine and upper-

25  extremity pain/radiculopathy limited the claimant; and (2) its employee Christina

26  Fleisher, MS, CRC, a vocational "Return to Work Case Manager" who performed

27  an employability analysis and irrationally concluded that Ms. Ibarra had the skills to

28  perform at least three purportedly alternative occupations, including *secretary*,

receptionist and customer service representative, based on Ms. Ibarra's prior 15 years of work experience. Hartford's claim denial relies on and mirrors the reasoning of its consultants.

34.    On August 30, 2017, Ms. Ibarra appealed Hartford's August 22, 2017 decision to terminate her benefits. She submitted personally, and through her doctors, her updated medical records, including those referenced in this Complaint. Ms. Ibarra pointed out that Hartford's denial letter was incorrect because, "According to my recent nerve test my condition is worse! The test shows more pinched nerves!" She explained that in the past two months she started experiencing additional symptoms, tremors and numbness. She explained that working even two days per week had become "very difficult . . . because of the severe pain and inflammation," "has hurt me physically" and, currently, she is "in pain 24 hours a day 7 days a week."[7]

35.    On September 21, 2017, following her appeal, her orthopedic spine surgeon through workers' compensation, Dr. Chon, performed another comprehensive in-person exam of Ms. Ibarra for his monthly follow-up visit. Ms. Ibarra complained of neck pain, as she had before. She stated that her pain "has slightly worsened since last clinic visit" and that she was experiencing numbness on the top of her right hand. Following his physical exam, Dr. Chon documented that Ms. Ibarra was "positive for neck pain." He diagnosed her with cervical radiculopathy. Dr. Chon's treatment plan included conservative pain management through exercise and activity modification, and a follow-up visit. Dr. Chon certified

---

[7] Under a recent Ninth Circuit ERISA disability decision, *Kibel v. Aetna Life Ins. Co.*, --- Fed.Appx. ---, 2018 WL 832870 (9th Cir., Feb. 13, 2018), Hartford was obligated to take these statements into account when deciding Ms. Ibarra's claim, including her subjective complaints of pain, especially because they are corroborated by objective imaging.

Case No.:



1    that Ms. Ibarra could work at most "partial duty," "2 days per week on

2    Tuesdays/Thursdays for 8 hours," in her job as a secretary/administrative assistant.

3

4         36.    Dr. Chon examined Ms. Ibarra for her follow-up on November 9, 2017

5    for neck pain. She complained that her pain had substantially worsened since her

6    last exam, between a 7 to 9 out of 10 in intensity, and that "her pain is gradually

7    getting worse with time." She stated that her pain became aggravated at work due to

8    her work activity. She was now experiencing "involuntary motion" of both upper

9    extremities and had been dropping things more. Dr. Chon performed a physical

10   exam, including objective tests. His tests confirmed that Ms. Ibarra was positive for

11   neck pain, had decreased sensation along her right C7 cervical nerve and weakness

12   in her right upper extremity [biceps, triceps, brachioradialis (forearm muscle) and

13   intrinsics (hand muscles)]. Based on all this foundation, including his objective

14   tests, an in-person physical exam and Ms. Ibarra's complaints, Dr. Chon continued

15   to diagnose her with cervical radiculopathy and certify her as disabled. In addition

16   to his prior conservative treatment plan, Dr. Chon ordered an MRI to corroborate his

17   diagnosis of nerve root impingement. He discussed with Ms. Ibarra surgery as a

18   potential option, but she is not a good candidate for surgery because of her

19   osteoporosis. Dr. Chon continued Ms. Ibarra on partial work duty, two days per

20   week for eight hours on Tuesdays/Thursdays, pending his next exam.

21

22        37.    On December 13, 2017, Dr. Chon took Ms. Ibarra off work completely.

23   During his exam on that date, he documented that her neck pain and related

24   symptoms again "have worsened since her last visit." He certified in his work status

25   form that Ms. Ibarra was totally disabled and could not work in any capacity, not

26   even sedentary work and not even with modified duties or work restrictions such as

27   working two days per week as before. He noted that his request for an MRI had

28   been approved and he would see her again following the MRI results in six weeks to



1  re-evaluate her.  He continued to diagnose her with cervical radiculopathy pending

2  the MRI.

3

4      38.    Dr. Davis, her primary care physician, continued to examine Ms. Ibarra

5  in-person on a monthly basis in addition to orthopedic spine surgeon Chon,

6  including on December 13, 2017, January 26, 2018 and February 21, 2018.  In each

7  of these exams, Dr. Davis documented Ms. Ibarra's medical history as including

8  cervical degenerative disc disease, bulging discs and foraminal narrowing in her

9  cervical spine, all objectively documented by a March 2015 cervical spine MRI.

10

11      39.    On January 8, 2018, Ms. Ibarra had the cervical MRI that was

12  requested by Dr. Chon, because of her chronic neck and upper-extremity pain.  The

13  MRI confirmed she had cervical radiculopathy.  Specifically, the MRI images

14  picture: (1) at C5-6, "left foraminal narrowing *with compression of the exiting left*

15  *C6 nerve root*" (emphasis added) (narrowing of spinal nerve passageways pinching

16  the nerve), from a 4mm-deep, broad-based disc protrusion and osteophyte complex

17  (bone spurs on spinal vertebrae); (2) at C5-6, "severe spondylosis" with disc space

18  narrowing (age-related wear and tear affecting the spinal discs in the neck,

19  sometimes causing bone spurs in the space for spinal nerves, in turn causing pinched

20  nerves and thus pain, numbness and weakness in the arms and hands); and (3) at C3-

21  4, hypertrophy in the right uncovertebral joint (enlargement of neck vertebrae joints)

22  causing moderate right-foraminal narrowing.[8]  The MRI confirmed that Ms. Ibarra's

23  cervical spine problems worsened since her March 2015 MRI two years earlier,

24  which showed severe problems but not nerve root compression at C5-6, unlike her

25  2018 MRI.

26  _____

27  [8] *See https://www.mayoclinic.org/diseases-conditions/bone-spurs/symptoms-causes/syc-20370212; https://www.mayoclinic.org/diseases-conditions/cervical-spondylosis/symptoms-causes/syc-20370787;*

28  *https://www.reference.com/health/uncovertebral-hypertrophy-4f218506cbfffe2d.*

Case No.:



40.     On January 11, 2018, Dr. Chon saw Ms. Ibarra to review her MRI films and for his regular monthly exam.  He concluded that the MRI showed, at the C5-6 vertebral level of Ms. Ibarra's cervical spine, a herniated disc, disc-height loss and posterior listhesis (forward displacement of a vertebrae).  Based on the MRI films and his in-person exam, he confirmed his prior diagnosis of cervical radiculopathy.  Dr. Chon documented that Ms. Ibarra's symptoms had been worsening but that taking her off the two-day-per-week work schedule had helped.  He noted that conservative treatments like physical therapy had not provided relief.  Dr. Chon explained to Ms. Ibarra the procedure of a bilateral epidural steroid injection at C5-6 for her severe pain.  She is not a good candidate because the disc space between vertebras is too small to safely inject.  He scheduled a return visit in six weeks and certified her work status as totally disabled.

41.     On February 22, 2018, Dr. Chon examined Ms. Ibarra in-person for her monthly follow-up.  She complained of severe neck/spine pain.  He documented that she had worsening symptoms in her neck, with associated tingling and tremors in her upper extremities, as well as headaches.  He noted that physical therapy and chiropractic care had not provided significant pain relief.  She rated her pain as 8 out of 10 in intensity.  Dr. Chon once again diagnosed Ms. Ibarra with cervical radiculopathy.  He put her on acupuncture treatment to try to reduce her neck pain, and noted that he will consider a bilateral C5-6 epidural steroid injection if the acupuncture does not help.  Though she is not a good candidate for such an injection because of disc space loss, he discussed the option again because of her severe pain.  Dr. Chon again certified in his work status form that Ms. Ibarra was totally disabled and could not work in any capacity, not even sedentary work and not even with modified duties or work restrictions, at least through April 19, 2018 (the date of his follow-up visit).

42.     On February 27, 2018, Ms. Ibarra asked Hartford to process her appeal and pleaded that her benefits should not have been terminated, based on the above-noted medical records, including objective MRI images and EMG tests.  She again confirmed that her condition had worsened as of 2017 "with increase[d] tremors, weakness, numbness and chronic pain" and that, while she was previously able to work two days per week, she had not been able to work at all since December 13, 2017.  She reminded Hartford that her doctors were "supporting that I am still permanently disabled" and had sent in documents confirming this.

43.     On March 30, 2018, based on the same reasoning, Hartford reaffirmed its initial decision to terminate Ms. Ibarra's disability benefits and denied her appeal. This time, it relied on the opinion of a different medical consultant, D. Kelly Agnew, M.D., an orthopedic surgeon from Professional Disability Associates ("PDA") who reviewed Ms. Ibarra's medical file but did not examine or speak with her or her treating physicians, and concluded that her medical records show she could work full-time, 40 hours per week, eight hours per day, in an occupation that requires "up to a medium level labor" because her condition, which he acknowledged includes nerve root compression and irritation in her cervical spine, bilateral carpal and cubital tunnel syndrome and several other medical conditions, "is simply an aging change, quite normal."

44.     Hartford did not do another employability analysis.  It continued to rely on Ms. Fleisher's prior August 2017 report (which had concluded that Ms. Ibarra has the transferable skills to work as a secretary, receptionist and customer service representative, jobs essentially the same as her occupation from which Harford found her to be totally disabled).  Hartford's appeal denial relies on and mirrors the reasoning of these two consultants and, based thereon, it concluded that Ms. Ibarra's disability benefits were no longer payable beyond August 1, 2017 under the Policy's

Case No.:



"any occupation" disability standard because she has the transferable work skills and physical capacity to perform the essential duties of at least those three purportedly other gainful occupations. Hartford, in its appeal-denial letter, failed to identify what Ms. Ibarra's own occupation was or the purportedly "other" occupations from her own occupation that its vocational consultant concluded she could transition to. Hartford acknowledged that Ms. Ibarra had neck pain, chronic bilateral upper-extremity numbness, pain and weakness, and that her condition had worsened. But it reasoned that the medical records did not contain evidence of severe-enough symptoms that would prevent Ms. Ibarra from performing "any occupation" as required by the Policy.

45.    The opinions of Hartford's biased "paper reviewers" are far less credible than Ms. Ibarra's highly qualified treating physicians. As detailed above, the medical evidence overwhelmingly establishes that Ms. Ibarra was and is disabled from performing any type of occupation (for which she has the transferable skills/experience to perform) during the relevant time, i.e., from August 2017 onward. Instead of accepting the medical records of her highly respected treating physicians who certified her disability, Hartford relied on the opinions of two biased medical consultants, Drs. Daniels and Agnew, who conducted mere "paper reviews" of Ms. Ibarra's medical records. Their opinions are less credible than those of the specialists who examined Ms. Ibarra in person, who treated her for years and who, therefore, are far better suited to render credible opinions.

46.    There are many problems with the conclusions of Hartford's "paper reviewers" and thus Hartford's benefits decision that is based on them. First, Dr. Daniels, Dr. Agnew[9] and the vendors through which Hartford retained them, PDA[10]

_____

[9] Dr. Agnew is not independent. A Westlaw search for his name shows 39 cases in which he was repeatedly retained by insurance companies or employers in workers'

Footnote continues on next page…

Case No.:

1    and MCN,[11] are Hartford's paid consultants used repeatedly by Hartford and other

2    insurers in the past to give disability opinions.  PDA[12] and MCN[13] cater to the

3    insurance industry according to their Websites.  They even brazenly market on their

4    Websites that their medical consultant opinions will support their insurance

5    company client's business objectives.[14]  Dr. Agnew has been widely criticized by

6    numerous federal judges in disability cases for contradicting himself and

7    disregarding the law in support of the insurers that hire him.[15]  A court will review

8    _____

compensation cases, but never the claimant.

[10] Hartford has retained PDA several times just in the last few years, per published cases.  *See Kamper v. Hartford*, 2018 WL 1414771, at *2 (D. Utah, Feb. 22, 2018); *Toro v. Hartford Life & Accident Ins. Co.*, 2017 WL 3593328, at *3 (E.D. Mich., Aug. 21, 2017); *Harding v. Hartford Life & Accident Ins. Co.*, 2017 WL 1316264, at *1 (N.D. Ill., Apr. 10, 2017); *Henderson v. Hartford Life Ins. Co.*, 2015 WL 12868175, at *4 (D.S.C., Mar. 9, 2015).

[11] Hartford has also retained MCN numerous times.  *See*, *e.g.*, *Potts v. Hartford Life & Accident Ins. Co.*, 272 F.Supp.3d 690, 699 (W.D. Pa. 2017); *Killian v. Hartford Life & Accident Ins. Co.*, 2017 WL 429905, at *6 (E.D. Pa., Jan. 31, 2017); *Coleman v. Am. Int'l Grp., Inc. Group Benefit Plan*, 87 F.Supp.3d 1250, 1256 (N.D. Cal. 2015); *Zenadocchio v. BAE Sys. Unfunded Welfare Ben. Plan*, 936 F.Supp.2d 868, 878 (S.D. Ohio 2013); *Frerichs v. Hartford Life & Acc. Ins. Co.*, 875 F.Supp.2d 923, 935 (D. Minn. 2012).

[12] "Professional Disability Associates (PDA) . . . is an innovative disability services company and industry leader that provides specialty risk resources, including medical, vocational and claim management services, to major disability insurers, reinsurers and self-insured employers;" "Our clients include 15 of the top 17 disability insurers in America;" "PDA provides best-in-class independent medical peer reviews to the disability insurance industry." *See https://www.professionaldisabilityassociates.com/ https://www.professionaldisabilityassociates.com/our-clients https://www.professionaldisabilityassociates.com/services/medical-reviews*

[13] "Peer Reviews . . . are completed for all insurance types Mitchell MCN serves: Disability, Workers' Compensation, Auto/PIP/Liability, and Health Insurance Plans." *See https://mcn.com/services/medical-peer-reviews/.*

[14] PDA's Website touts that: (1) Its core values include an "entrepreneurial spirit" such that, "We embrace each circumstance with creative solutions that lead to a positive outcome for both our customers [disability insurers] and PDA;" (2) We deliver service "that satisfies our customers in every aspect of our work," including by "providing a consultative approach that supports our clients in attaining their business objectives." *See https://www.professionaldisabilityassociates.com/physicians-network* and *https://www.professionaldisabilityassociates.com/why-pda*.  MCN markets to its disability insurer clients on its Website: "Reports that meet your expectations 100% of the time." *See https://mcn.com/for-clients/.*

[15] *See Gilmore v. Liberty Life Assurance Co. of Bos.*, 2014 WL 1652048, at *6 (N.D. Cal., Apr. 24, 2014) (criticizing Dr. Agnew and the insurer that retained him for disregarding the claimant's subjective complaints of pain and requiring objective medical evidence of it, contrary to the plan documents and Ninth Circuit case law);

Footnote continues on next page…

Case No.:

Hartford's claim denial with skepticism because it relied on financially conflicted, biased consultants who are sold out to the insurance industry.[16]

47.    Second, Hartford's consultants failed to examine Ms. Ibarra and failed to speak with her or her doctors, who have regularly treated her for years and consequently gained great insight into her work limits. Therefore, their opinions, based purely on a "cold file review" of Ms. Ibarra's medical records, carry far less weight. Drs. Daniels and Agnew simply do not have the benefit of the insight gained through personal observation. Hartford itself stated in its referrals to these doctors that it was critical for them to speak with Ms. Ibarra's treating physicians about their opinions before rendering their own. Neither of Hartford's consultants followed these instructions and, consequently, their opinions each lack foundation that Hartford itself found paramount to formulate credible opinions.

48.    Third, Hartford's medical consultants spent little time on their assignments and thus the Court should place little emphasis on their conclusions. Their invoices indicate that Dr. Daniels spent just three hours and Dr. Agnew 6.25 hours, both in one day, to review Ms. Ibarra's large volume of medical records (hundreds of pages and an over-1,000-page claim file) and write their opinion reports. Ms. Ibarra's attending physicians, by contrast, have regularly examined and treated Ms. Ibarra over many years. It is not surprising that the reports of Hartford's medical consultants are wrought with errors and cannot be trusted. For example,

---

*Bladowski v. Prudential Ins. Co. of Am.*, 2010 WL 4880775, at *5, *8-11 (E.D. Mich., Nov. 12, 2010) (criticizing Dr. Agnew's opinion as confusing and contradicting himself; stating "there are several perplexing omissions in . . . Dr. Agnew's . . . assessments" and "the Court finds, however, that Dr. Agnew's contradictory statements and confusing analysis of Bladowski's hip surgery . . . demonstrates that Prudential's decision lacked deliberate reasoning and was arbitrary and capricious").

[16] *See Demer v. IBM*, 835 F.3d 893, 901-03 (9th Cir. 2016); *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 832 (2003).



when explaining his main opinion, Dr. Daniels stated that he looked at Ms. Ibarra's "functional abilities from 2/3/16 through 8/2/15," a nonsensical time period, especially considering that Hartford has conceded that Ms. Ibarra was disabled from February 2015 to August 2017.  Dr. Daniels parroted this nonsensical, obviously mistaken time period from Hartford's medical consultant referral.  He should have caught this key issue before reviewing Ms. Ibarra's medical records and preparing his opinion report.  But he never did, and thus the Court should disregard his entire report because he apparently looked at an irrelevant time period.

49.    Fourth, Dr. Agnew's opinions are inconsistent with and do not logically follow from the objective medical evidence he cites in his report.  He concedes that Ms. Ibarra's MRI images, CT scans, myelograms and electrodiagnostic studies picture cervical disc osteophyte complex (bone spurs in the cervical spine) "causing some [nerve] root compression," cervical nerve root irritation at C5, cervical degenerative disc disease, radicular symptoms, right acromioclavicular arthrosis (cartilage in a shoulder joint wears down, causing pain in the shoulder/neck, including on movement), bilateral carpal (wrists) and cubital (elbows) tunnel syndrome (irritated/inflamed, compressed nerves in wrists/elbows, respectively, causing pain, numbness and tingling in hands and arms) and ulnar negative variance (ulna forearm bone is shorter than radius forearm bone, which can lead to ligament problems).[17]  But then he illogically concludes from this evidence, without reasonable explanation, that Ms. Ibarra can work fulltime because her condition "is simply an aging change, quite normal," and that she has no limitations when using her hands and arms for fine manipulation tasks like typing.  That makes no sense

---

[17] Dr. Agnew discusses most of this medical evidence in the "Medical Analysis" section of his report.  Hartford, conspicuously, in its appeal denial letter, avoids this part of Dr. Agnew's report, quoting only the more innocuous parts, favorable to Hartford, i.e., Dr. Agnew's illogical conclusions.  This tends to show that Hartford failed to conduct a full and fair review of the medical evidence as ERISA requires, or fulfill its fiduciary duties to its insured, Ms. Ibarra.

1   and flatly contradicts the medical evidence he even acknowledges.  Hartford's

2   consultant concedes that Ms. Ibarra has objectively verified pinched and irritated

3   nerves in her neck, elbows and wrists that cause pain and numbness there that

4   radiates to her arms, forearms and hands, as well as worn-out cartilage in her right

5   shoulder that causes pain upon movement.  That is not "quite normal," contrary to

6   what Dr. Agnew illogically concludes, and, obviously, would not permit her to work

7   full time in the occupations Hartford posits.

8

9       50.    Dr. Agnew fails to explain why these medical conditions would not

10  interfere with Ms. Ibarra's functional ability to work in the three "any occupations"

11  Hartford concluded to which she could transition given her skill set (secretary,

12  customer service representative, receptionist).  Instead, he concludes that she can

13  work full time in an occupation that requires "up to a medium level labor."  But that

14  skirts the issue.  Hartford does not even maintain that Ms. Ibarra should work in a

15  "medium level labor" job but a sedentary one like a secretary.  How can Ms. Ibarra

16  type for prolonged periods with these objectively verified medical conditions,

17  including carpal and cubital tunnel syndrome and extremity pain/numbness from

18  cervical radiculopathy?  How can she fixate on a computer screen for hours, in fact

19  all day long, with debilitating pain in her neck from pinched/irritated cervical spinal

20  nerves?  Dr. Agnew fails to explain any of that.  The federal courts have already

21  criticized him in the past for precisely this issue.  *See Bladowski*, *supra*, 2010 WL

22  4880775, at *10.  Indeed, Ms. Ibarra's January 2018 cervical spine MRI objectively

23  proves beyond any doubt that she has a 4mm-deep, broad-based disc protrusion and

24  osteophytes causing "foraminal narrowing with compression of the exiting left C6

25  nerve root," which Dr. Agnew even notes in the medical record summary section of

26  his report but then disingenuously calls "normal."  Contrary to what Dr. Agnew and

27  Hartford concluded without explanation, it follows from the medical evidence he

28  cites in his report that Ms. Ibarra cannot work full time as a secretary (or in another

1  similar position requiring her to repetitively use her upper extremities for typing and

2  to look at a computer screen for long periods of time).

3

4    51.    Fifth, Dr. Agnew discounted Ms. Ibarra's objectively documented

5  medical conditions as "normal" and "age-related changes," which disregards the

6  Policy's disability standard and, therefore, is improper.[18]  Under the Plan's

7  language, it does not matter whether Ms. Ibarra's age, or something else, caused her

8  cervical spine and upper-extremity disorders.  They are still medical disorders that

9  Hartford must consider when deciding her functional work abilities.

10

11    52.    Indeed, Dr. Agnew and Hartford improperly required a higher standard

12  of proof of disability than Hartford's Policy.  The Plan's disability definition states

13  that Ms. Ibarra's disability must result from a "sickness."  The Plan does not define

14  "sickness," but that term is generally understood to mean, "1. the condition of being

15  sick or diseased; illness; 2. a malady or disease"; *see Webster's New World College*

16  *Dictionary* (4th Edition, 2010), by Houghton Mifflin Harcourt, or "the state of being

17  ill or unhealthy."[19]  The Plan does not exclude coverage for sicknesses or disabilities

18  caused by age.  A sickness thus would obviously include diseases and maladies like

19  cervical degenerative disc disease, cervical-spine nerve-root compression and

20  irritation, acromioclavicular arthrosis and carpal and cubital tunnel syndrome,

21  irrespective of whether those disorders were caused in part by Ms. Ibarra's advanced

22  age.  Because Hartford and its medical consultant required a higher disability

23  standard than the Plan, Hartford's benefits decision was improper and must be

24  reversed.

25  _____

26  [18] In *Saffle v. Sierra Pacific Power Co.*, 85 F.3d 455, 459-60 (9th Cir. 1996), the
    Ninth Circuit ruled that requiring a claimant to meet a standard that is not present in

27  plan documents "effectively imposes a new requirement for coverage," but because
    "an administrator lacks discretion to rewrite the Plan," to do so is improper.

28  [19] *See https://www.collinsdictionary.com/us/dictionary/english/sickness.*

-26-



Case No.:

53.    Sixth, Hartford's consultant, Dr. Daniels, concluded that Ms. Ibarra can work at most 32 hours per week.  That, in and of itself, is fatal to and completely undermines Hartford's benefits decision (that Ms. Ibarra is not disabled under the Policy's standard).  The opinion of Hartford's *own* medical consultant necessarily means that Ms. Ibarra is "Disabled," defined by the Policy in pertinent part as, "You are prevented from performing one . . . of the Essential Duties of: . . . Any Occupation," because the Policy also states that Ms. Ibarra's "ability to work the number of hours in [her] regularly scheduled workweek is an Essential Duty."  Ms. Ibarra consistently worked full time, 40 hours per week, for her former employer DaVita from the time she started working there in 2012 until the time she became disabled in February 2015.  Working 40 hours per week was her regularly scheduled workweek and, therefore, is an "Essential Duty" under the Policy.  Ms. Ibarra cannot do that, according to one of Hartford's own medical consultants, Dr. Daniels. Because she cannot perform one of the "Essential Duties" of any occupation, as stated by Hartford's own consultant's medical opinions, she is unequivocally disabled under the Policy.

54.    Seventh, Hartford's benefits decision is incorrect because it relied on conclusory opinions from two "paper reviewers" that did not make it clear in their reports why they disagreed with the claimant's examining doctors.  *See Carrier v. Aetna*, 2015 WL 4511620, at *12-13 (C.D. Cal., July 24, 2015); *Bladowski*, *supra*, 2010 WL 4880775, at *8 (criticizing Dr. Agnew for failing to explain why he disagreed with the treating physician's disability finding).  Drs. Daniels and Agnew state their conclusion that Ms. Ibarra can work "full-time" (either 32 hours/four days or 40 hours/five days per week, respectively) without explaining why their opinions are drastically different than her treating physicians, Drs. Chon and Knight. Drs. Chon and Knight concluded that, from 2015 to 2017, she could work at most 16 hours / two days per week and, since 2017, she cannot work at all (as a

Case No.:

secretary/administrative assistant or other similar job) because her bilateral upper-extremity and neck pain significantly worsened in 2017.  Hartford's medical consultants made no effort to explain why they disagreed with Dr. Chon's (or Dr. Knight's) key opinions.  Hartford even instructed its consultant Dr. Agnew that he did not need to bother getting the opinions of her treating doctors before forming his own.  *See* Dr. Agnew Rpt., p. 2 ("no [attending physician] letter needed per client").  Therefore, their opinions are not credible under *Carrier*.

55.     Eighth, Dr. Daniels' report is internally inconsistent.  Therefore, Hartford should not have relied on it.  Dr. Daniels, in the same report, inexplicably concluded *both* that Ms. Ibarra was "capable of sustained full time work" and that her "number of hours per day should be limited to 8 hours, and the number of days limited to 4 days weekly."  He reasoned that she had "some definite cervical spine problems with an EMG suggestive of radiculopathy" and, "[t]herefore, a day of rest, preferably in the middle of the work week" was required.  That is not full-time work.

56.     Ninth, Hartford should not have terminated benefits based on Dr. Daniels' report because it does not support that conclusion.  Dr. Daniels opined that "right upper extremity repetitive motions should be avoided at this time" by Ms. Ibarra.  The obvious inference is that Ms. Ibarra cannot work as a secretary or in any other occupation requiring repetitive typing with her right arm.[20]  But Hartford incorrectly concluded Ms. Ibarra could work "full-time" as a secretary based on his report.  Moreover, Dr. Daniels himself is unsure about the correctness of his opinions regarding Ms. Ibarra's work limits, candidly admitting: "it is at present *unknown* how much the cervical spine and upper extremity pain/ radiculopathy

---

[20] Those are the precise types of occupations that Hartford's vocational consultant concluded Ms. Ibarra had the skills to work in.

Case No.:

limits the claimant;" and "it *appears* that the claimant should be able to function" until she has cervical spinal fusion surgery. (Emphasis added). Hartford should not have relied on Dr. Daniels' internally inconsistent report because it is filled with uncertain, shaky, contradictory opinions, particularly because all the physicians who examined Ms. Ibarra in-person concluded the opposite from Dr. Daniels (and Dr. Agnew), that Ms. Ibarra was and is disabled from working as a secretary/ administrative assistant or any other type of occupation requiring repetitive use of her neck and arms, such as computer use and typing.

57.    Tenth, Hartford's two medical consultants' opinions contradict each other. Because its own consultants could not even agree, Hartford should not have relied on either of their opinions, nor should the Court. While Dr. Agnew concluded that Ms. Ibarra could work 40 hours per week, Dr. Daniels concluded she could work at most 32 hours and conceded that she needed a day of rest in the middle of the week. They also disagree about the following:

(1) Dr. Daniels concluded that an EMG documented that Ms. Ibarra had a cervical radiculopathy but Dr. Agnew "no cervical radiculopathy."

(2) Dr. Daniels concluded that Ms. Ibarra's objective imaging and electrodiagnostics depict: cervical radiculopathy "likely" requiring a cervical spine decompression surgery in the future; "numerous medical problems"; degenerative disc disease at C3-6; spinal stenosis at C5-6; right-disc protrusion at C3-4; left-disc protrusion at C5-6; cervicalgia; radicular pain radiating from the neck to the extremities; cervical-spine, right-shoulder and upper-extremity pain; osteoporosis; and bilateral cubital tunnel syndrome, but Dr. Agnew concluded all these objective image/electrodiagnostic findings were normal for her age.

(3) Dr. Daniels concluded that Ms. Ibarra could reach above her waist level with her right arm only "if performed on an occasional basis," but Dr. Agnew

-29-



concluded she could do so "frequently (2.5 to 5.5 hours)."[21]

(4) Dr. Daniels concluded that Ms. Ibarra could, at most, sit three hours, stand one hour or walk one hour at a time before needing a break and sit eight hours, stand four hours and walk four hours total per workday. But Dr. Agnew concluded that she had no sit, stand or walk limits of any kind.

(5) Dr. Daniels concluded that Ms. Ibarra could not climb at all because of cervical, upper-extremity and knee pain, but Dr. Agnew said that she had no climbing limitations.

58. Finally, Hartford's decision to deny Ms. Ibarra's disability benefits based on the "paper reviews" of Drs. Daniels and Agnew was improper, as such a course of action has been criticized by the Ninth Circuit.[22] That is especially true because, here, two treating specialists, Drs. Chon and Knight, who have each examined Ms. Ibarra in-person regularly for years, have repeatedly certified her as disabled from performing her occupation as a secretary/administrative assistant (or any type of occupation with similar computer-use responsibilities), based on their exam observations, objective range of motion/palpitation tests and irrefutable objective MRI image, x-ray and EMG results. The neutral workers' compensation QME physician, Dr. Washington, also did. In fact, every doctor who examined Ms. Ibarra concluded that she was disabled. In their opinion, she cannot return to work in any occupation requiring prolonged computer use and typing because she has debilitating neck, right-shoulder, bilateral-arm, elbow, forearm, wrist and hand pain, numbness, weakness and tremors from pinched and irritated nerves in her cervical

---

[21] Either way, Hartford's conclusion that Ms. Ibarra could work as a secretary, customer service representative or receptionist, all three occupations requiring repetitive, constant typing and mouse work above waist level, is not supported by its medical consultants' opinions.
[22] *See Montour v. Hartford*, 588 F.3d 623, 630 (9th Cir. 2009) (citing *Met. Life Ins. Co. v. Glenn*, 554 U.S. 105 (2008)). *See also Michaels v. Equitable Life*, 305 F.App'x 896, 906-07 (3d Cir. 2009).

Case No.:



spine, elbows and wrists (caused by herniated discs, radiculopathy and bone spurs in her cervical spine, worn-out cartilage in her shoulder joint and cubital and carpal tunnel syndrome, from repetitive typing and computer use), which prevents her from working for more than two days per week, eight hours per day, in such an occupation.

59.    The opinions of these highly qualified physicians, having regularly examined the patient for years and having spoken with her in detail, carry far more weight than Hartford's "paper reviewers," because the former had a better opportunity to assess her credibility and functional abilities.  *See Williams v. United Omaha*, 2013 WL 5519525, at *12 (N.D. Ala., Sept. 30, 2013) citing *Black & Decker*, *supra*, 538 U.S. at 832 (courts are required to evaluate the weight of each doctor's opinion based on the extent of the patient treatment history and his/her qualifications).  That court explained why the opinion of a treating physician is usually more credible: "[D]irect contact with the patient over a period of time would provide a more thorough opportunity to assess her credibility regarding level of pain and the true pattern of her abilities." *Id.*  The court found the claimant disabled by focusing heavily on the opinions of her treating physicians.  *See also Jebian v. Hewlett-Packard*, 349 F.3d 1098, 1109 n.8 (9th Cir. 2003) (same).

60.    Hartford's orthopedic consultants did not examine Ms. Ibarra, though its Policy permitted it.  That raises questions about the credibility of their opinions and the accuracy of Hartford's benefits denial.  *See Shaw v. AT&T*, 795 F.3d 538, 550 (6th Cir. 2015).

61.    Hartford's "paper reviews" lack the foundation and insight gained through an in-person exam; contradict the medical evidence and each other; ignore key medical-exam notes, objective MRI images, X rays and EMG studies; are

wrought with errors because little time was spent on them; require a higher standard for disability than the Plan; disregard the Policy's definition of "Essential Duties"; and are conclusory, poorly reasoned and shrift in analysis. Accordingly, Hartford's benefit determination is incorrect. This is especially true because the treating physicians who examined Ms. Ibarra in person were far better suited to render credible opinions than Hartford's "paper reviewers," as the former are multiple board-certified orthopedic surgeons who treated the patient regularly for years, as opposed to biased consultants used repeatedly by Hartford in the past who never examined or spoke to Ms. Ibarra or her attending physicians.

62.    Hartford's "any occupation" vocational analysis is also flawed and led it to improperly terminate Ms. Ibarra's disability benefits. One of the primary reasons Hartford terminated those benefits as of August 2017 was its conclusion that, based on the employability analysis made by its employee vocational consultant, Ms. Fleisher, at least three other occupations besides Ms. Ibarra's own occupation existed that she could perform, given her skills, education, work experience and functional capacity. Hartford relied entirely on Ms. Fleisher's report for vocational issues. But, as explained below, the vocational consultant's conclusions are flawed and thus led Hartford to improperly terminate Ms. Ibarra's benefits.

63.    Ms. Fleisher's report contradicts what Hartford had already concluded. That is, while Hartford had decided that Ms. Ibarra could not perform the essential duties of her own occupation as a "unit secretary," and thus paid her "own occupation" disability benefits based thereon for the entire two-year period, Ms. Fleisher's employability analysis concludes essentially the opposite: that Ms. Ibarra is not disabled from performing "any occupation" because she can perform the duties of three "other" occupations besides her own for which she qualifies, i.e.,



*secretary*, customer service representative and receptionist.  The glaring problem in her analysis is that one of these occupations is Ms. Ibarra's own occupation (and the other two have job duties that are strikingly similar to a secretary's).  The DOT and O*NET data upon which Ms. Fleisher relies confirm that repetitive typing and computer usage are essential duties of each of these three occupations.  It makes no sense for Hartford to simultaneously maintain that Ms. Ibarra cannot perform the duties of her own occupation as a secretary but *can* perform the duties of the three purportedly fillable occupations, inexplicably including "secretary," that its vocational consultant identified in her employability analysis.  There is absolutely no explanation in the administrative record for this conspicuous, obvious flaw in Hartford's analysis.

64.    Apparently, Hartford's claim representatives did not read Ms. Fleisher's report, but rather summarily adopted it with no thought or analysis.  That is the most reasonable inference from the evidence.  Hartford never disclosed or discussed, in either its initial termination letter or its appeal denial, the job duties of those three purported other fillable occupations, or the skills required to perform them.[23]  If they had, they would have seen that the report was nonsensical because it used Ms. Ibarra's own occupation as a secretary/administrative assistant as one of the "other" occupations she could supposedly perform.  They would have seen that Ms. Fleisher's report flatly contradicted Hartford's conclusion that Ms. Ibarra does not have the functional ability to work as a secretary.  For this reason alone, Hartford's benefits decision must be overturned.

65.    Hartford and its vocational consultant never analyzed Ms. Ibarra's job

---

[23] That is improper.  *See Turner v. Life Insurance Co. of North America*, 2017 WL 6000099, at *3–4 (W.D. Wash., Dec. 4, 2017) (holding that a vocational consultant must define the duties of the other "any occupations" in his transferable skills analysis, including whether full-time work is required).

1  duties in any detail, either.  Thus, it was not possible for Hartford to reach a

2  reasoned conclusion about her transferable skills or the jobs in which she has the

3  experience to work.  This lack of foundation also completely undermines Ms.

4  Fleisher's vocational report and Hartford's benefits decision that is based on it.  The

5  administrative record does not contain Ms. Ibarra's official job description from her

6  employer, DaVita.  Ms. Fleisher was not given a copy and devoted just a few words

7  in her report to discussing Ms. Ibarra's job duties (which she took exclusively from

8  Ms. Ibarra's employee statement in her LTD application).  But Ms. Ibarra only

9  sparsely identified her job duties in her statement as, "admin. assistant – computer

10  and telephone support."

11

12       66.    Finally, Hartford improperly terminated Ms. Ibarra's disability benefits

13  after paying her these benefits for two years.  Hartford changed its position about

14  Ms. Ibarra's disability status, from disabled to "not disabled," without substantial

15  evidence that her medical condition improved.  That was unequivocally improper

16  under applicable case law.[24]  Hartford paid Ms. Ibarra disability benefits for two

17  years, from August 2015 to August 2017.  Based on her medical records, it

18  concluded that she was disabled from performing her own occupational duties as a

19  secretary during that entire time and, in fact, since February 2015.  It then reversed

20  course and terminated her benefits despite there being no substantial new evidence

21  _____

22  [24] *See Fifield v. HM Life Ins. Co.*, 2012 U.S. Dist. LEXIS 140880, *21 (D.N.H. 2012) (holding that it was improper for administrator to find the claimant "was not

23  disabled based on the same medical records that they deemed sufficient to support her disability" and the termination was not supported by "substantial evidence");

24  *Saffon v. Wells Fargo*, 522 F.3d 863, 871 (9th Cir. 2008) ("MetLife had been paying Saffon long-term disability benefits for a year, which suggests that she was already

25  disabled. In order to find her no longer disabled, one would expect the MRIs to show an improvement, not a lack of degeneration"); *McOsker v. Paul Revere*, 279

26  F.3d 586, 589 (8th Cir. 2002) (Circuit Court explained "[w]e are not suggesting that paying benefits operates forever as an estoppel so that an insurer can never change

27  its mind; but unless information available to an insurer alters in some significant way, the previous payment of benefits is a circumstance that must weigh against the

28  propriety of an insurer's decision to discontinue those payments.")

Case No.:

establishing that she could work or that her condition had improved.  In fact, the

evidence shows that her condition *worsened* in 2017 after she was terminated, as she

had to stop working altogether instead of work two days per week as she had since

August 2015.  Her doctors' September 2017 to 2018 progress notes consistently

document "worsening symptoms" and that she was taken completely off work due

to "worsening symptomology," as conceded even by Hartford's own medical

consultant, Dr. Agnew.  Her recent 2018 MRI shows nerve-root compression that

her 2015 MRI did not.  Moreover, the very same type of medical records Hartford

used to approve Ms. Ibarra's claim, it later used to terminate it.  Because Hartford

decided Ms. Ibarra was no longer disabled without substantial new medical evidence

to support its position, its decision to terminate her benefits was incorrect.

67.   On June 22, 2018, after Hartford had denied Ms. Ibarra's administrative

appeal, the SSA decided that Ms. Ibarra was and is disabled and entitled to SSDI

benefits.  True and correct copies of the SSA's Disability Determination and

Transmittal and Disability Determination Explanation are attached to the Complaint

as Exhibits "1" and "2," respectively.

68.   On July 14, 2018, the SSA sent a letter to Ms. Ibarra, notifying her that

it found she had become disabled under Social Security rules as of December 2017.

It explained that doctors and other trained staff decided she was and is disabled

under its rules.  A true and correct copy of the SSA's award letter is attached to the

Complaint as Exhibit "3."

69.   On September 7, 2018, Ms. Ibarra, through her counsel McKennon

Law Group PC ("Counsel"), provided Hartford with all these documents, in fact, the

entire SSA file for her SSDI claim.  Counsel asked Hartford to review them and

reverse its benefits decision based on the new records.  Ms. Ibarra could not have

provided these important SSA records to Hartford during the administrative process because it had closed as of March 30, 2018; they did not yet exist.  On September 12, 2018, Hartford sent a letter to Counsel, refusing to consider or even review the SSA's records.  Hartford maintained its position that Ms. Ibarra is not disabled.

70.    The SSA's decision and related records finding Ms. Ibarra disabled under Social Security rules are important and necessary for this Court to review when reviewing Hartford's benefits decision de novo.

71.    An independent government entity — the SSA — found Ms. Ibarra to be disabled under a disability standard similar to Hartford's Policy, based on a vocational analysis and an impartial medical expert opinion from an independent physician retained by the SSA: M. Gleason, M.D.  Dr. Gleason concluded that Ms. Ibarra has severe medical impairments from peripheral, right-upper-extremity/ cervical neuropathy that causes her the following physical functional inabilities/ restrictions/limitations, among others: handle and finger (both fine and gross manipulation) with her right hand; reach in any direction (including in front of her, laterally and overhead); sit, stand or walk for more than six hours per eight-hour workday; or lift/carry 20-pound items more than occasionally.  He further concluded that "medical improvement not expected."  Based thereon, the SSA concluded that Ms. Ibarra was and is disabled under its rules.  It did so on her very first application. That is strong evidence that Hartford made the wrong claim decision by terminating Ms. Ibarra's disability benefits.[25]

---

[25] *See Rouleau v. Liberty Life*, 2017 WL 359466, at *7 (W.D. Mich., Jan. 25, 2017) ("In its de novo review, the Court weighs the SSA determination heavily."); *see also Montour v. Hartford*, 588 F.3d 623, 635 (9th Cir. 2009) (the Ninth Circuit warned that "not distinguishing the SSA's contrary conclusion may indicate a failure to consider relevant evidence").

Case No.:



72.     To qualify for disability benefits, Hartford's Policy requires that Ms. Ibarra prove she is unable to perform one or more of the essential duties of "any occupation" of which she is qualified by her past education, training or work experience (and meets certain minimum earnings potential).  The Social Security Act has a similar standard, that Ms. Ibarra prove she cannot perform the duties of her own past work (last 15 years) as an administrative assistant/secretary *and* any other type of gainful work.[26]  Ms. Ibarra was awarded disability benefits by the SSA after it found her disabled under Social Security rules, based on impartial medical expert opinion.  Yet, while Hartford terminated her Policy benefits, the SSA awarded Ms. Ibarra SSDI and "found that [she] became disabled under our rules on December 13, 2017" at least through December 2022.[27]  The SSA thus concluded that Ms. Ibarra has been disabled from performing *any type* of work including her own as an administrative assistant/secretary during the relevant post-termination period of August 2, 2017 onward.  That is strong, almost insurmountable evidence that Ms. Ibarra meets the Policy's disability standard, i.e., that she cannot perform the duties of any gainful occupation, including as a secretary, receptionist or customer service representative (which each would require the use of her right hand and extremity to type on a keyboard and to reach forward to her workstation's keyboard and mouse).

73.     The proper standard of review is de novo.  Any grant of discretionary

---

[26] *See Rowell v. Aviza*, 2012 WL 1672497, at *17 (N.D. Cal., May 14, 2012); 423 U.S.C. § 423(d)(1)(A); 423 U.S.C. § 423(d)(2)(A) (standard for SSDI disability benefits: "An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . .").

[27] The SSA would have concluded that Ms. Ibarra became disabled under its rules much earlier, in 2015, but she was able to work (and was working) usually two days per week from 2015 through December 2017, so did not qualify for SSDI until she completely ceased work.

Case No.:



1   authority contained in the Plan is void in light of California Insurance Code Section
2   10110.6.  Plaintiff has been a California resident at all times relevant.  The Plan was
3   renewed after January 1, 2012, the date the statute became effective.  Hartford
4   rendered its benefits decision after that date.  Thus, the denial of benefits at issue
5   must be reviewed de novo.

6

7       74.    In a de novo review, "the burden of proof is placed on the claimant" to
8   establish entitlement to plan benefits.  *Muniz v. Amec Const. Mgmt., Inc.*, 623 F.3d
9   1290, 1294 (9th Cir. 2010).  "When conducting a de novo review of the record, the
10  court does not give deference to the claim administrator's decision, but rather
11  determines in the first instance if the claimant has adequately established that he or
12  she [qualified for benefits] under the terms of the plan."  *Id.* at 1295-96.  The trial
13  court performs an "independent and thorough inspection" of the plan administrator's
14  decision in order to determine if the plan administrator correctly or incorrectly
15  denied benefits.  *Silver v. Executive Car Leasing Long–Term Disability Plan*, 466
16  F.3d 727, 733 (9th Cir. 2006).  De novo review permits the trial court to "evaluate
17  the persuasiveness of conflicting testimony and decide which is more likely true."
18  *Kearney v. Standard Ins. Co.*, 175 F.3d 1084, 1095 (9th Cir.1999).

19

20      75.    Regardless of the standard of review this Court applies, Defendants
21  reached an incorrect decision, given the overwhelming medical records and other
22  evidence presented during the claim that established that Plaintiff was and is
23  disabled within the meaning of the Plan.

24

25      76.    Plaintiff exhausted her administrative remedies under the Plan and has
26  the right to bring a legal action for benefits under ERISA Section 502(a).  Hartford's
27  March 2018 denial letter on appeal concedes as much.

28

Case No.:



77.    Plaintiff is now and has at all times relevant remained "disabled" as defined by the Plan, and has now and at all times relevant convincingly demonstrated her disability through medical records and other documents, information and correspondence.

## FIRST CAUSE OF ACTION

To Recover Benefits, Attorneys' Fees, Pre-Judgment Interest Under ERISA Plan – 29 U.S.C. Sections 1132(a)(1)(B), (g)(1)

(Plaintiff against Hartford and Does 1 through 10)

78.    Plaintiff incorporates the previous paragraphs as though fully set forth herein.

79.    ERISA Section 502(a)(1)(B), 29 U.S.C. Section 1132(a)(1)(B), permits a plan participant to bring a civil action to recover benefits due to her under the terms of a plan, to enforce her rights under the terms of a plan and/or to clarify her rights to future benefits under the terms of a plan.

80.    At all times relevant, Plaintiff has been entitled to LTD benefits under the Plan.  By denying Plaintiff's ongoing claim for LTD benefits under the Plan, by terminating her benefits and by related acts and omissions, Defendants violated, and continue to violate, the terms of the Plan and, specifically, the Policy, and Plaintiff's rights thereunder.

81.    Defendants have failed to follow even the most rudimentary claims processing requirements of ERISA and of the Department of Labor Regulations and have failed to conduct a "full and fair review" of the claim denial, as required by 29 U.S.C. Section 1133(2).  Thus, even if the Plan vests discretion in Defendants to

Case No.:



1   make benefit determinations, no deference is warranted with regard to Defendants'

2   handling of this claim.  *See Booton v. Lockheed Medical Benefit Plan*, 110 F.3d

3   1461, 1465 (9th Cir. 1997); *Jebian v. Hewlett-Packard Company Employee Benefits*

4   *Organization Income Protection Plan*, 349 F.3d 1098, 1105 (9th Cir. 2003) ("When

5   decisions are not in compliance with regulatory and plan procedures, deference may

6   not be warranted.").

7

8   82.   A "prudent person" standard is imposed on ERISA fiduciaries.  *See* 29

9   U.S.C. § 1104(a)(1)(b).  A "fiduciary" is also under a duty of loyalty and care to the

10  participants and beneficiaries of the Plan.  *See* 29 U.S.C. Section 1104(a)(1).  Under

11  ERISA: (1) a fiduciary must discharge its duties solely in the interest of plan

12  participants and beneficiaries and for the exclusive purpose of providing plan

13  benefits to them; (2) a fiduciary must act with care, skill, prudence and diligence;

14  and (3) a fiduciary may not act in any capacity involving the Plan, on behalf of a

15  party whose interests are adverse to the interests of the Plan, its participants, or its

16  beneficiaries.  Defendants' handling of Plaintiff's disability benefit claim falls far

17  short of these standards.

18

19  83.   For all the reasons set forth above, Hartford's decision to deny

20  disability benefits to Plaintiff was arbitrary, capricious, wrongful, unreasonable,

21  irrational, incorrect, contrary to the evidence, contrary to the terms of the Plan and

22  contrary to law.  Defendants improperly denied this claim, as the evidence shows

23  their denial decision was not only incorrect but arbitrary and capricious.  Further,

24  Defendants' denial decision and actions heighten the level of skepticism with which

25  a court views a conflicted administrator's decision under *Abatie v. Alta Health &*

26  *Life Insurance Co.*, 458 F.3d 955 (9th Cir. 2006) and *Metropolitan Life Insurance*

27  *Co. v. Glenn*, 544 U.S. 105 (2008).  Defendants' denial of Plaintiff's claim was

28  incorrect and improper, based upon all the evidence discussed herein.

Case No.:

84.    Alternatively, Plaintiff has met the burden of establishing she is disabled under a de novo standard of review due to symptoms including, without limit, debilitating neck, right-shoulder, bilateral-arm, elbow, forearm, wrist and hand pain, numbness, weakness and tremors from pinched and irritated nerves in her cervical spine, elbows and wrists, all of which continuously plagued her from February 2015 through the present and continuing.

85.    As a direct and proximate result of Defendants' denial of disability benefits, Plaintiff has been deprived of LTD benefits from and after August 2, 2017.

86.    As a direct and proximate result of the denial of her claim for LTD benefits, Plaintiff has been required to incur attorneys' fees to pursue this action and is entitled to reimbursement of these fees pursuant to 29 U.S.C. Section 1132(g)(1).

87.    A controversy now exists between the parties as to whether Plaintiff is disabled as defined in the Plan and therefore entitled to LTD benefits.  Plaintiff seeks the declaration of this Court that she meets the Plan definition of disability, and is entitled to benefits under the Plan.  In the alternative, Plaintiff seeks a remand to the claims administrator for a determination of Plaintiff's claim that is consistent with the terms of the Plan.

88.    Plaintiff alleges all of the same conduct against Does 1 through 10 as she does against Hartford in this First Cause of Action and in this Complaint.

### **PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiff prays that this Court grant the following relief against all Defendants:

Case No.:



1.  For all Plan benefits due and owing Plaintiff, including LTD benefits;

2.  For costs and reasonable attorneys' fees pursuant to 29 U.S.C. Section 1132(g);

3.  For pre-judgment and post-judgment interest on the principal sum, accruing from the date the obligations were incurred. *See Blankenship v. Liberty Life Assurance Co. of Boston*, 486 F.3d 620, 627 (9th Cir. 2007) ("A district court may award prejudgment interest on an award of ERISA benefits at its discretion."); *Drennan v. General Motors Corp.*, 977 F.2d 246, 253 (6th Cir. 1992). Specifically, Plaintiff seeks interest at the rate of 10% per annum, pursuant to California Insurance Code Section 10111.2, at the rate she was receiving on her lost investments, if any, or at a different rate as permitted by federal law; and

4.  For such other and further relief as this Court deems just and proper.

Dated:  February 21, 2019              McKENNON LAW GROUP PC

By:  _____
       ROBERT J. McKENNON
       JOSEPH S. McMILLEN
       Attorneys for Plaintiff Vicky Ibarra

Case No.:

